HOWARD M. WINN

*v.*

JOHN I. BLACKMAN.

*Opinion filed October 23, 1907.*

1. ELECTIONS—*what does not overcome force of ballots as evidence.* Ballots having a cross in the circle at the head of one ticket and a cross in the square before the name of one candidate for a certain office on another ticket are properly counted, on contest, for the latter, even though they were counted for the ticket having the cross in the circle by the judges, who did not see the cross in the square, where there is no evidence that the ballots could have been tampered with except with the connivance of the election officials, who will not be presumed to have committed a criminal offense.

2. SAME—*the fact that marks on ballot may be traced from its back does not invalidate it.* The fact that the marks on a ballot are made so heavily that they may be traced on the back of the ballot by the raised or embossed appearance thereof does not justify rejecting the ballot as having distinguishing marks, in the absence of any proof that the marks were made in the carrying out of some fraudulent purpose.

3. SAME—*what is not evidence that votes were being bought.* The mere facts that a number of ballots in the same precinct were

marked in substantially the same manner and that in all of them the imprint of the pencil could be seen on the back of the ballots are not, of themselves, evidence that the votes were being bought, and that some one in the polling place was watching the appearance of the ballots to convey information thereof to the purchaser.

4. SAME—*ballot is invalid where one judge endorses another's initials thereon.* A ballot endorsed by one judge with the initials of another judge cannot be counted, even though the latter had given the other judges directions to endorse the ballots with his initials in his absence. (See note below.)

5. SAME—*when ballot is properly rejected as a blank.* A ballot which has nothing upon it to show that it had ever been voted except a slight roughing of the surface inside one of the circles, indicating that something had been erased therefrom by a rubber, although the closest investigation fails to disclose a trace of a cross, is properly treated as a blank ballot.

6. SAME—*cross in the circle or square is essential.* Upon contest, a ballot which is marked with squares opposite the names of all candidates on a certain ticket except one, in whose square the mark is V-shaped and has no point of intersection within the square which can be called a cross, cannot be counted for such candidate if there is no cross in the circle at the head of the ticket.

7. SAME—*what are not, in general, distinguishing marks.* Marks upon a ballot which can be reasonably explained consistently with an honest purpose of the voter, and which were manifestly made through mistake or inadvertence or because the voter changed his mind as to the method of marking his ballot, are not, in general, distinguishing marks.

8. SAME—*mark appearing to be a flourish of pencil is not a distinguishing mark.* A mark in the form of a semi-circle, connecting three lines of the cross in the circle at the head of a ticket, apparently being a flourish of the pencil, is not a distinguishing mark; nor is a very imperfect cross, being something in the form of the letter U with a mark across it near the bottom, apparently made by a person so nervous as to be nearly incapable of making the marks.

9. SAME—*distinguishing mark must be such as would identify the ballot.* The distinguishing mark which the law prohibits being placed upon a ballot is such a mark as was apparently placed there by the voter with the intention of furnishing means for identifying

Note:—Proposition four, though appearing in the opinion of the court, has the concurrence of three judges only, namely, Justices Hand, Farmer and Vickers. Justices Cartwright, Scott and Carter dissent from that particular proposition, and Justice Dunn takes no part in the decision of the case.

the ballot, in order to accomplish an evasion of the law as to secrecy; and this question is largely one of fact, which must be determined from an inspection of the particular ballot.

10. SAME—*the ground upon which ballots having distinguishing marks are rejected.* There is no express provision of the Australian Ballot law that a ballot bearing a distinguishing mark shall be rejected, and the ground upon which such ballots are rejected is that they violate the secrecy of the ballot, to preserve which is the main purpose of the law.

11. SAME—*what is apparently a distinguishing mark.* A letter carefully made in ink at the bottom of a ballot and placed near an ink blot is properly regarded as a distinguishing mark such as warrants the rejection of the ballot.

12. SAME—*what does not vitiate ballot.* The facts that a cross has been placed in the square opposite the name of the prohibition candidate for sheriff but lines are drawn through such candidate's name and the name of the republican candidate written thereunder in pencil, although his name was printed on the republican ticket, does not vitiate the ballot, either upon the ground of distinguishing marks or as in violation of the law prohibiting candidates from having their names appear upon more than one ticket, since such law deals only with the rights of candidates.

13. SAME—*effect where crosses are made in more than one circle.* The marking of two or more party tickets by crosses in the circles has the effect of nullifying the vote only in so far as the tickets bear the names of candidates for the same office; and if only one of the tickets so marked has candidates for county offices the vote should be counted for such county officers, though nullified as to offices for which the other marked tickets have candidates.

14. SAME—*index hand drawn upon ballot is not necessarily a distinguishing mark.* Where a ballot is marked as a straight ticket except that a cross is made in the square opposite the name of one candidate on another ticket, an index hand drawn in pencil with the finger pointing to such name may be regarded as placed there by the voter with the honest purpose of calling the attention of the judges to the vote, and is not necessarily a distinguishing mark.

15. SAME—*when ballot should not be rejected.* A ballot marked as a straight ticket, with a six-pointed cross in the circle but with a cross in the square opposite the name of a candidate for one office on another ticket, should be counted for such candidate upon contest.

16. SAME—*what ballots are invalid.* A ballot picked up off the floor by the election judges after the count and marked "void" by them and not strung or counted by them; a ballot not bearing the

initials of any judge of the election, and a ballot having no crosses thereon but the whole face of several of the squares blackened by pencil, are invalid and cannot be counted for any one.

CARTWRIGHT, SCOTT and CARTER, JJ., specially concurring.

APPEAL from the County Court of Edgar county; the Hon. WALTER S. LAMON, Judge, presiding.

J. E. DYAS, and F. K. DUNN, for appellant.

H. S. TANNER, FRANK T. O'HAIR, JAMES K. LAUHER, and STEWART W. KINCAID, for appellee.

Mr. JUSTICE VICKERS delivered the opinion of the court:

At the election in November, 1906, Howard M. Winn was the republican and John I. Blackman was the democratic candidate for sheriff in Edgar county. By the official canvass of the votes Winn received 3448 votes and Blackman 3422. Blackman filed a petition to contest the election, alleging errors in the count of the votes in the various precincts of the county. Winn answered the petition and denied the alleged errors, charged counter-errors, and alleged that in the second precinct of Young America township the ballots had been fraudulently changed so as to show a greater number of votes for Blackman and a less number for Winn than were cast for them, respectively, and counted by the judges. On the trial of the contest in the county court of Edgar county the court found that Blackman had received 3421 votes and that Winn had received 3396 votes and declared Blackman duly elected, and rendered judgment against Winn for costs, from which he has prosecuted this appeal.

On the hearing the ballots were all produced and recounted, and there were 3348 votes counted for appellant and 3346 for appellee without objection. Included in appellee's 3346 votes are eight votes from the second precinct of Young America township which appellant charges were

changed after the ballots had been cast, so as to increase
the vote of appellee eight votes and decrease the vote of ap-
pellant eight votes. There were 174 ballots that were ob-
jected to by one or the other of the parties. Of these 174
ballots the court counted 48 for appellant and 75 for ap-
pellee, making the total vote as finally determined by the
court, 3396 for appellant and 3421 for appellee. The re-
maining 51 ballots of the 174 that were objected to, the
court held illegal and refused to count them for either party.
The errors and cross-errors assigned bring up for review
the rulings of the court on substantially all of these various
ballots.

Appellant insists that the evidence shows that eight bal-
lots counted by the court for appellee were shown to have
been tampered with and marked for the appellee when they
should have been counted for appellant. These ballots were
marked in the republican circle and were straight republican
ballots, except that a distinct cross appears on each of them
opposite the name of appellee. There is nothing on the face
of any of these ballots that tends to discredit them or to
raise a suspicion that they were not in the same condition
when opened in court that they were in when they left the
hands of the voters. The evidence upon which appellant
relies to prove that these eight ballots had been changed
after they were voted, is the testimony of the three election
judges in the township where they were cast and the repub-
lican and prohibition challengers who were present, together
with the fact that the returns from that precinct showed that
these eight ballots had been counted by the election judges
for appellant. There were 195 votes cast in the second pre-
cinct in the town of Young America, of which, by the re-
turns of the election judges, the appellant received 85 and
appellee 94. The remainder of the voters either cast their
ballots for the prohibition candidate or did not vote for
sheriff. On the final count by the county court appellant's
vote was reduced to 77 and appellee's was increased to 102.

The testimony of the witnesses upon which appellant relies, shows that when the judges were ready to commence the canvass of the votes the ballots were first taken out of the ballot-box, unfolded and examined, and the straight republican ballots were placed in one pile on the table, the straight democratic ballots in another, the straight prohibition ballots in a third, and the mixed or scratched ballots were placed in a fourth pile. One of the judges, Mr. Stone, drew the ballots from the ballot-box and passed them to Mr. Bren, another of the judges, who unfolded them and determined which of the piles they belonged to, and placed them accordingly. After the ballots were all drawn from the ballot-box and classified, as above stated, they were then counted three times, in order to determine whether the number of ballots corresponded with the number of names on the tally sheet. The eight votes in question were placed in the pile of straight republican ballots. After the ballots had all been canvassed they were then strung on a wire, the republican ballots first, democratic second, prohibition next and then the mixed or scratched ballots, the ballots going on face down. The ends of the wire were then brought together and fastened and the ballots placed in a sack and sealed up and put in charge of one of the judges of the election. It is not contended that the sack had been opened or the ballots disturbed in any way after they were sealed up by the judges on the night of the election. When the sack was opened in court the ballots were taken off in the reverse order from which they were placed on the wire, the republican ballots coming off first, the democratic ballots second, the prohibition next and the mixed ballots last. The ballots came off face upward. This is accounted for by the fact that the ballots were taken off of the opposite end of the wire from where they were put on. Upon an examination of the so-called straight republican ballots the eight ballots in question were found plainly marked in the republican circle and a plain, distinct cross opposite appellee's

name on the democratic ticket. These eight ballots were not found in a group, but were scattered promiscuously through the republican straight ballots.

Appellant's contention is, that if these ballots had been marked for appellee at the time the canvass was made, the persons present making the canvass would necessarily have discovered it, and the fact that they did not see a cross opposite the name of appellee in any of these ballots is sufficient to warrant the court in finding that the ballots were not so marked at the time the canvass was made. It must be admitted that it is very extraordinary that these judges and the two challengers would overlook this number of scratched ballots. Such a mistake could not happen except through the gross carelessness and inattention of these election officers. A glance at the ballots is all that is necessary to see a cross opposite appellee's name, and still there is not a particle of evidence that any one had any opportunity to falsify these ballots unless it was some one of the persons who were in the room during the time the canvass was being made. There is some evidence that other persons than the challengers and the election officers were in the room occasionally when the canvass was being made, (persons who were admitted to make inquiry as to the result,) but it is not pretended that any of these persons handled any of the ballots or had any opportunity to do so. If the ballots were fraudulently tampered with, it must have occurred during the canvass and in the presence of the election judges. It is not to be presumed that any of the election officials would be guilty of committing a criminal offense by tampering with these ballots, nor can it be supposed that they would be so utterly indifferent to the discharge of their duties as to permit any unauthorized person to handle the ballots, whereby an opportunity would be afforded to perpetrate such a fraud. The most charitable view, and to our minds the most reasonable, is, that the election officials overlooked these ballots, and when they saw the cross in the

republican circle they did not make an examination further, but concluded that the ballots were straight republican ballots and classified them accordingly. We more readily come to this conclusion when we consider that in the counting of the ballots that occurred after they had been separated into piles the ballots were not handled, but they were counted by turning up the corners of the ballots as one would count the leaves in a book. Mr. Bren testifies that while he did not see any cross opposite the name of appellee on these ballots, yet he says that such crosses might have been there and he overlooked them. Bren is the election judge who unfolded the ballots and determined which class they belonged to. The other witnesses did not examine them as much as Bren did. In our opinion the county court properly counted these eight ballots for appellee.

Appellant next insists that the court erred in rejecting 23 ballots (being exhibits 11 to 33) in the second precinct of Embarrass township. These ballots were all very similar and were all straight republican ballots, and they were all rejected for the same reason,—that they had distinguishing marks on them. These 23 ballots were each marked with a proper cross in the republican circle and by a cross opposite the name of each candidate for a county office on the republican ballot. There were no other marks of any kind or character upon any of these ballots, except in ballots 17 and 29 a cross was placed opposite each of the candidates for the General Assembly, and in ballot 24 a cross was placed in the square opposite the name of Charles A. Allen, candidate for representative. In all other respects these ballots are regular and free from any marks or blemishes. The ballots, when examined from the back, show a trace of the pencil mark,—that is, there is a slightly raised or embossed appearance on the back of the ballots, indicating that the marking had been done with a somewhat heavier hand than was necessary or that a hard lead pencil had been used, so as to make the imprint of the marking visible from

the back.  Appellee contends that marking a ballot in this way is a distinguishing mark, and the county court sustained that view.  To this we cannot assent.  Upon an examination of a large number of other ballots we find that it is possible to locate the cross from the imprint of the pencil on the back of the ballots.  In fact, there are many ballots in the record on which one can locate the marking by simply rubbing the fingers over the surface of the back of the ballot, without looking at it at all.  The paper upon which the ballots are printed is a white, soft, cheap book paper, and by placing a sheet of blotting paper under the ballot an ordinary stroke of a lead pencil will be plainly traceable on the back.  It is true that it was not necessary that the voter should mark both the circle and the squares in order to vote a particular ticket, but it is well known that many voters do so mark their tickets.  It is not shown or claimed that the persons who voted these tickets did not intend to vote them exactly as they were marked, and there is no evidence that these ballots were marked in this particular manner in order to distinguish them from other ballots.

Appellee contends that because 23 of these ballots were voted in the same precinct, marked in substantially the same way, it is evidence that there was some one on the outside interested for appellant who was buying these votes and some one on the inside watching for the appearance of the crosses on the back of the ticket, and that in some way information would be conveyed to the purchaser on the outside that the ballot had been delivered according to contract, so that the voter could receive the consideration that was agreed to be paid.  The most serious objection to appellee's contention on this point is, that there is no evidence in this record to support it.  We are of the opinion that it would be a very dangerous rule to hold that a ballot is to be rejected and the voter deprived of his constitutional right to vote, if, upon an examination of the back of the ballot, the marking of the ballot can be traced.  If such rule were

applied in this case it would deprive appellant of 23 votes and appellee would lose as many for the same reason, and perhaps more. In fact, our attention is called to 65 ballots which were counted for appellee, the markings on which are discernible from the back of the ballot. While it is true a distinguishing mark which will justify the rejection of a ballot may appear upon the back as well as upon the face of the ballot, still the mere fact that the imprint of the pencil with which the voter marks the face of his ballot may be discernible upon examination of the back of the ballot, and which occurs through mere inadvertence and without the knowledge of the voter, cannot be held to be such distinguishing mark. There is no contention that these 23 republican ballots were cast by democrats or that there was any corresponding decrease from the normal democratic vote in this precinct.

The court erred in rejecting the 23 ballots for appellant in the second precinct of Embarrass township, and they should be counted for appellant.

It is next urged by appellant that the court erred in refusing to count five ballots for appellant (being exhibits 166 to 170, inclusive,) cast in the first precinct of Young America. The objection that appellee makes to these five ballots is, that they did not have the initials of one of the judges endorsed on the back thereof by the same judge whose initials appeared thereon. The judges of this township were T. J. Coffman, S. S. Gough and William Turley. The evidence shows that when the polls were opened it was agreed among the judges that Coffman should endorse his initials on the ballots, that Turley should take them from the voters and place them in the ballot-box and that Gough should attend to the register. This method was followed. When Coffman went to dinner some question was made as to whether he had signed up enough ballots for use in his absence. Before he went to his dinner Coffman said to the other judges, "If you need any more, go ahead and sign

them yourselves." One of the other judges, in the absence of Coffman, signed Coffman's initials "T. J. C." on the five ballots in question and they were handed out to voters and were voted. The county court sustained the objection to these ballots. They were all cast for appellant. Section 22 (paragraph 186) of the Australian Ballot law (2 Starr &. Cur. Stat. p. 1688,) provides that "one of the judges shall give the voter one, and only one, ballot on the back of which such judge shall endorse his initials in such manner that they may be seen when the ballot is properly folded;" and section 26 of the same chapter provides, that "no ballot without the official endorsement shall be allowed to be deposited in the ballot-box and none but ballots provided in accordance with the provisions of this act shall be counted." The endorsement of the initials of one of the judges under these sections of the statute is mandatory, and without it the vote cannot be counted. (*Kelly* v. *Adams,* 183 Ill. 193; *Caldwell* v. *McElvain,* 184 id. 552.) The statute contemplates that the judge who passes the ballot to the voter should endorse his initials on the ballot in his own handwriting. (*Choisser* v. *York,* 211 Ill. 56.) In the case last above cited, in condemning the use of a rubber stamp for endorsing the ballots, this court said (p. 68) : "The statute is, not only that the initials of one of the judges shall be placed upon the ballot, but that the particular judge who hands the ballot to the voter shall endorse his initials thereon. Every man's handwriting possesses certain peculiarities which tend to distinguish it from every other handwriting. By writing his initials upon ballots the judge doing so should be able to distinguish those which are genuine, and could generally do so." If the judge who passed out these five ballots had endorsed his own initials upon them there would be no question about the regularity of the ballots, but the statute was not complied with by his endorsing the initials of Coffman thereon. There was no error in refusing to count these five ballots for appellant.

We have thus far disposed of 28 of the 51 rejected ballots, leaving 23 yet to be considered. Of the remaining 23 ballots that were not counted for either party by the court, appellee insists that Nos. 95, 103, 104, 110, 111, 118, 119, 121, 161 and 173 should have been counted for him, while appellant insists that these ballots were properly rejected by the court, and that Nos. 96, 97, 101, 102, 106, 107, 164 and 172 should have been counted for appellant and that Nos. 35, 94, 116, 117 and 120 should not have been counted for appellee. Appellee objects to 43 other ballots that were counted for appellant but has not insisted upon his objections in his brief, and for that reason these objections will be considered as waived. We will now consider appellant's specific objections to individual ballots.

Ballot No. 96 is a blank ballot. There is nothing on the face of it to indicate that it had ever been voted, except there is a slight roughing of the surface inside the republican circle, indicating that something might have been erased by the use of a rubber. It is impossible to say what mark or sign may have been erased from this circle. The closest investigation does not disclose a trace of a cross. The court properly rejected No. 96.

Ballot No. 97 was rejected by the court because there is no cross either in the circle or opposite the name of appellant. This ruling appellant insists is erroneous. The ballot is marked with a cross opposite the name of each candidate on the republican ticket for which the voter intended to vote on that ticket. Opposite the name of appellant, inside the square, is a pencil mark like this ▷. There is no point inside the square where there is an intersection of the lines which can be called a cross. The character seems to have been made by a short stroke of the pencil, followed by another short stroke at right angles with the first. There does not appear to have been any attempt on the part of the voter to make a cross, and this ballot was properly rejected under the authority of *Parker* v. *Orr,* 158 Ill. 609.

229—14

Ballot No. 101 was rejected by the court on the ground that there was a distinguishing mark upon it. This ballot has one line drawn across the circle of the republican ticket and then it has a cross in each of the squares of the republican ticket. It is this pencil line drawn across the circle which led the court to reject the ballot. In this we think there was error. Evidently the voter, knowing the two methods by which he could vote a straight republican ticket, first concluded to make a cross in the circle and drew one line, then changed his mind and concluded to mark each of the squares, and accordingly put a cross in all of the republican squares of the ticket, thereby voting a republican ticket by that method. We reach this conclusion from the fact that the ballot shows an intention to vote a straight republican ticket. A mark of this character, which can reasonably be explained consistenly with the honest purpose of the voter and which was manifestly made through mistake, inadvertence or because he changed his mind as to the method by which he intended to mark his ballot, is not a distinguishing mark, within the meaning of the law. This ballot, in our opinion, should have been counted for appellant.

Ballot 102 was rejected by the court for the alleged reason that it also had distinguishing marks upon it. This ballot was marked in the republican circle in this way ⊗. There is in this ballot a perfect cross in the republican circle, and the only irregularity is in the semi-circle which connects three points of the cross together. This was evidently simply a little flourish of the pencil, and not made as a distinguishing mark. We think this ballot should have been counted for the appellant under the authority of *Parker* v. *Orr, supra.*

Appellant insists that ballot 106, which was rejected by the court, should have been counted for him. The only mark upon this ballot is found in the republican circle, and is like this ⊕. The court rejected this ballot, either because there was no cross in the circle or because the mark-

ing in the circle was a distinguishing mark. There are two crosses in the republican circle. We think the ballot should have been counted. The character found in the republican circle indicates to our minds that it was probably put there by some one who was very nervous,—so much so that it was with great difficulty that a cross was made. We think that the marking on this ballot belongs to the same class as two ballots passed on in *Parker* v. *Orr, supra,* and under the authority of that case the manifest intention of the voter should prevail and the ballot be counted as it was manifestly intended by the voter. This ballot should be counted for appellant.

Ballot 107 was rejected by the court because in the opinion of the court there was a distinguishing mark upon it. This ballot is properly marked in the republican circle with a cross. On the lower right-hand corner, on the face of the ballot, there is a light pencil line almost straight, about one inch and a quarter long; the line then turns almost at right angle and runs in a curve about one inch; there is then a little jog or fork and the line runs back toward the first stroke almost parallel with the second line, forming a sort of triangular figure that does not resemble anything with which we are acquainted. The lines of this character are very lightly and somewhat irregularly drawn. We are of the opinion that this mark ought not to be held as a distinguishing mark. It is true that it is possible that it might have been placed on the ballot by the voter for the purpose of distinguishing it from other ballots, yet it is also possible that such a character might have gotten on the ballot through inadvertence or mistake. It is a mark that is very difficult to describe, and we do not see how a voter could with any certainty describe such mark so that another person would be able with certainty to identify the ballot. The distinguishing mark prohibited by the law is such a mark as will separate and distinguish the particular ballot from other ballots cast at the election. It is some sort of

a mark put upon the ballot to indicate who cast it and to furnish the means of evading the law as to secrecy. (*Pierce v. People,* 197 Ill. 432; *Rexroth* v. *Schein,* 206 id. 80.) In the case last above cited, on page 100, this court said: "Therefore, not every mark made by a voter on his ballot which may separate and distinguish the particular ballot from other ballots cast at the election will necessarily result in the declaration that the ballot is invalid. If it appears from the face of the ballot that such marks or writings were placed thereon as the result of an honest effort on the part of the voter to indicate his choice of candidates among those to be voted for at the election, and that the voter did not thereby intend or attempt to indicate who voted the ballot, the ballot should not be rejected as to candidates for whom there is thereon a choice expressed in compliance with the requirements of the statute."

Whether a given mark upon a ballot is or is not a distinguishing mark, within the meaning of the Australian Ballot law, is largely, if not wholly, a question of fact. (*Kelso* v. *Wright,* 110 Iowa, 560; *Perkins* v. *Bertrand,* 192 Ill. 58.) This question must be determined from an inspection of the original ballot itself. The original ballots in this case have been certified to this court and we have examined them, consequently the trial court did not have any better opportunity for determining these questions than is afforded this court by an inspection of the original ballots. In order to warrant the rejection of a ballot because of a distinguishing mark, the court should be able to say that such mark was placed there by the voter for the purpose of distinguishing his ballot from others. (3 Current Law, p. 1172; *Rexroth* v. *Schein, supra.*) It is not every mark or blot that may be placed on the ballot by the voter himself that is a distinguishing mark, nor should a ballot be rejected because there appears upon it some mark which the court believes would enable the voter who cast the ballot to identify it as the ballot voted by him. The Australian Bal-

lot law does not contemplate that the voter will ever see his ballot again after it is deposited in the ballot-box. By carefully studying the face of his ballot the voter could readily recognize the ballot he had voted by the manner in which the crosses had been made, or by an almost inconceivable number of things which might be upon the ballot or be placed there by the voter without any thought that he was marking it for the purpose of identification. The title of the act, as well as the general scope of its various provisions, indicates that one of the main purposes sought to be accomplishd by the Australian Ballot law is to preserve the secrecy of the ballot. There is no express provision in our statute that a ballot containing a distinguishing mark is to be rejected, and the ground upon which such a ballot is rejected is that it violates both the letter and the spirit of the law intended to guard the secrecy of the ballot. In many of the States having a similar election law there are express provisions declaring all ballots illegal and void which bear any distinguishing marks, and where the courts have had occasion to construe such provisions the evil sought to be remedied has entered into the construction given and influenced the conclusion reached. Thus, the Supreme Court of Indiana, in *Sego* v. *Stoddard,* 136 Ind. 297, (36 N. E. Rep. 204,) in discussing the subject of distinguishing marks under the statute of that State, said:

"So that the statute was the outgrowth of the desire of all to rid the State of the burning disgrace and ominous danger to popular government, and the leading idea and thought of the whole act was, not to afford relief against the fraud of vote-buying and bribery at elections after its commission, but it was to devise a plan by which the honest voter could not only be freed from intimidation by making his vote a secret known only to himself and his God, but it was to absolutely shut the door against making merchandise of his vote by the corruptible voter, as near as human ingenuity could devise such a plan. That the plan has proven emi-

nently successful is evidenced by the fact that all political parties warmly approve of the law and that thirty-odd of our sister States have since substantially adopted it. The idea was not, as appellant's counsel seem to think, to so provide as to render it impossible for the purchased or bribed voter to afterwards identify the ticket he voted by looking at and inspecting it, because the other provisions of the act provide for a destruction of the ballots after they are counted and before anybody except the officers can see them, but it was to guard against the possibility of the vote-seller indicating to the buyer in advance how his ballot would be distinguished from the other ballots in the box, so that the buyer or his agent, who may be one of the election officers, could tell, when the bribed voter's ballot was reached in the count, that such bribed voter had carried out his contract. It was believed that if it could be rendered impossible for the buyer or his agent to identify the ballot voted by the purchased voter from a mere indication beforehand how it should be marked the desired end would be reached, because it was believed that, as a general thing, a vote-buyer would not risk his money on a vote-seller without some assurance other than the mere word of the bribed voter."

In the American and English Encyclopedia of Law (vol. 10, 2d ed. p. 728,) it is said, that unless the ballot has been marked intentionally, and so as to enable a third person to determine from an inspection of it, without other aid, that it was deposited by a particular person, the judges of the election should presume that the marking was inadvertently done and count the ballot.

In our opinion ballot 107, being otherwise fair and free from suspicion, should not have been rejected on the ground that it contained a distinguishing mark, and the ballot should have been counted for appellant.

Ballot 164 was rejected by the court because it had a distinguishing mark upon it. The mark upon this ballot is

a small letter "t" near the bottom of the ballot and to the right of the center. The letter bears evidences of having been made carefully and is placed near an ink blot. A careful examination of this mark leads us to conclude that it might easily be a distinguishing mark. While it is not at all clear to our minds that it was so intended, still we are inclined to agree with the court below that the ballot was properly rejected.

The court refused to count ballot 172 for appellant, and this is assigned as error. This ballot is marked with a cross in the prohibition circle and with a cross in each of the squares on that ticket. Marion Clark's name was printed on the ballot as the prohibition candidate for sheriff. The square opposite Clark's name was marked with a cross. The name "Marion Clark" was erased by several lines of lead pencil being drawn through it. The paper near the name "Marion Clark" is slightly torn, which was evidently done by the voter in his attempt to erase Marion Clark's name from the ballot. Below the name "Marion Clark" the name of appellant is written in lead pencil. The ballot in all other respects is free from objection. We are satisfied that the erasing of Clark's name and the writing of "Howard M. Winn" below it was done by the voter in attempting to express his choice for sheriff. The voter adopted a rather clumsy method of casting his vote for sheriff, but there is nothing illegal in the method adopted.

Appellee insists that by writing the name of appellant in the prohibition ticket, thereby making his name appear under both the republican and prohibition appellations, the amendatory act of 1903 is thereby violated, and for that reason this ballot should be rejected. The amendatory act referred to, which is found in Starr & Curtis' Statutes, (vol. 5, p. 200,) prohibits any candidate from having his name printed under more than one party appellation, and provides that in case a candidate has been nominated by two or more political parties he may withdraw his name from all

but one of said nominations and elect upon which ticket he desires to have his name appear, and if he fails to exercise his right of selection then his name cannot be printed upon either ticket. This statute deals with the right of the candidate to have his name printed upon more than one ticket, but does not purport to deny the voter the privilege of writing the name of any person for whom he desires to vote upon the ticket. In *Pierce* v. *People,* 197 Ill. 432, it was decided that every legal voter has a right to vote for the candidate of his own selection, and if the name of such candidate is not printed on the official ballot he has the right to insert it in some blank space on the ticket and vote for the candidate of his choice. (See, also, *Sanner* v. *Patton,* 155 Ill. 553.) And in the late case of *Smith* v. *Reid,* 223 Ill. 493, it was held that the writing in of names on a ticket and voting for them on that ticket was not illegal, even though the names so written in were printed in other places on the ballots as those of candidates for the same office for which the names were written in, and that the names so written in were not distinguishing marks. Under the authority of these cases ballot 172 should have been counted for appellant. The fact that his name is not written in immediately opposite the square does not affect the legality of this vote. The erasure of the name of the prohibition candidate for sheriff and writing the name of appellant immediately below it clearly indicate the intention of the voter to cast this vote for appellant, and it should be so counted. *Parker* v. *Orr, supra.*

Ballots 35 and 94 were counted by the court for appellee. These ballots are objected to by the appellant on the ground that they contain distinguishing marks. They may be considered together. Ballot 35 has the name "George Meyers" written in ink on the face of the ballot, about one-half inch from the lower edge of the ticket. There is no office designated in connection with the name of George Meyers, and George Meyers' name is not printed upon any

of the tickets as a candidate for any office.  Ballot No. 94 has the name "George Mares" written above the democratic ticket.  The democratic tickets had no name printed on them under the title of representative in the General Assembly.  A blank space was left under the title of that office, in which a large number of persons who voted that ticket wrote the name of George Meyers.  By referring to those tickets the conclusion must be reached that by some sort of concert of action or common understanding the democratic party was trying to elect said George Meyers to the lower branch of the State legislature.  To vote for him it was necessary to write his name under the title of that office in the space left for that purpose.  In view of the fact, which is clearly shown by the ballots introduced in evidence, that George Meyers was being voted for, generally, by persons who voted the democratic ticket, the writing of the name of George Meyers on ballot 35 and George Mares on ballot 94 was no doubt the result of an effort to vote for him.  At all events it seems probable that such was the purpose of the voter, and we are not inclined to disturb the decision of the court below in regard to these two ballots.

Ballot 116 is objected to by appellant on the ground that it contains distinguishing marks.  This ballot has three small strokes of the pencil near the margin below the prohibition ticket.  It belongs to the same class as ballot 107, already discussed, and what is there said with respect to that ballot will apply to 116.  The ballot was properly counted for appellee.

Ballot 117 was counted for appellee, over appellant's objection.  The objection is that it bore a distinguishing mark.  The mark on this ballot was a letter "V" on the back of it, in imitation of a printed "V."  This ballot should have been rejected for the reasons heretofore given in discussing ballot 164.

Ballot 120 was objected to by appellant but was properly counted for appellee.  The small mark on the back of the

ballot cannot be regarded as a distinguishing mark, within the rules heretofore laid down by the authorities cited.

We now come to consider ballots that were objected to by appellee. Ballot 95 was a straight democratic ballot, marked with a cross in the circle. There was also a cross in the circle opposite the socialist party name and another cross in the circle opposite the socialist labor party, and there was a small check-mark in the circle opposite the prohibition party appellation but there is no cross in this circle. Neither the socialist nor socialist labor party had any candidates' names printed on its ticket for county officers. The cross in the democratic circle indicated a vote for all the candidates on that ticket. This vote, however, was neutralized for all the candidates except the county candidates by the crosses made in the socialist and socialist labor party tickets, but these crosses could have no effect on the vote for county officers. The marking of two or more party tickets in the circle only nullifies the ballot in so far as both tickets bear the names of candidates for the same office. (*Parker* v. *Orr, supra.*) The little check-mark in the prohibition circle will not justify the rejection of the ballot as a distinguishing mark. The court erred in not counting this ballot for appellee.

Ballot 103 was rejected by the court. The ballot is mutilated by being cut across the left-hand end of the ballot, taking off a part of the names of all the candidates for State officers on the democratic ticket, with one exception. The democratic circle is gone entirely and all the squares opposite the names of the democratic candidates are gone. There is a cross in the republican circle and a cross above the name of Walter S. Lamon, candidate for county judge, and a cross to the left of the name John I. Blackman on the democratic ticket, but neither of these crosses, nor any part of the lines thereof, is within the squares. This ballot was properly rejected because it was plainly distinguishable from other ballots, and was properly not counted for either party.

Ballot 104 is a straight democratic ballot, marked in the circle of that party ticket, except there is a cross in the square opposite the name of Clay F. Gaumer, candidate for member of the General Assembly. To the right, and below the name of Gaumer, is an index hand pointing to the name of Gaumer, made in pencil. Undoubtedly the purpose of the voter was to call the attention of the judges to the fact that he had voted for Gaumer, to prevent his ballot being counted as a straight democratic ballot. While such a character might be a distinguishing mark, still we are satisfied that the index finger pointing to the vote for the prohibition candidate for the legislature was placed there with an honest purpose and out of an abundance of caution lest the vote should be overlooked. In our opinion the court erred in refusing to count this ballot for appellee.

Ballot 110 was thrown out by the court. This is a straight republican ticket except for William Morton, democratic candidate for county treasurer. There is a cross in the square opposite the blank space on the democratic ticket for member of the legislature and there are two pencil marks in the square opposite appellee's name. The character is more like a check-mark, the points of which come together outside the square, the points extending up into the square, than it is like a cross. This mark is not a distinguishing mark and the ballot should have been counted for appellant. But appellant has not saved his exception to this ruling of the court on this ballot but concedes that the court properly ruled thereon, and therefore the ballot will not be counted for either party.

Ballot 111 is marked in the republican circle by three straight lines crossing in the center, forming a six-pointed star. There is a cross in the square opposite appellee's name on the democratic ticket. This ballot should have been counted for appellee, and the court erroneously threw it out. The marking of the circle on this ballot is like the marking of the circle shown on page 373 of *Tandy* v. *Lavery,* 194 Ill.

372. Under the authority of that case this ballot should not have been rejected, and it will accordingly be counted for appellee.

Appellee insists that ballot 118 should have been counted for him. To this we cannot assent. This ballot stands on the same footing as ballot 110. We think it might properly have been counted for appellant, but he does not claim it. It certainly cannot be counted for appellee. It is a republican ticket, and there is no cross in the square opposite the appellee's name.

Ballot 119 stands in the same class with 110 and 118. It might have been counted for appellant, but he has not insisted upon it and appellee is not entitled to it.

Ballot 121 was marked "void" by the judges of the election and was not strung or counted by them for either party. The evidence of the judges shows that this ballot was picked up off the floor after the count was over and marked "void," and it never was in the ballot-box. The court properly refused to count it for either party.

Ballot 161 was properly rejected because it does not bear the initials of any of the judges on the back of it. *Caldwell* v. *McElvain, supra.*

Ballot 173 was properly rejected for the reason that there are no crosses in any of the circles nor in any of the squares on the entire ballot. It was not a vote for any one. Instead of making a cross the voter has undertaken to blacken the whole face of several squares with a lead pencil. The voter either did not know how to vote or did not try to vote. There is no attempt to comply with the law, and the ballot was properly rejected.

The result reached by us after going through this record very carefully and considering every ballot separately to which objection has been made by either party, may be summarized as follows: Appellant has 3348 votes that are unquestioned. The trial court gave appellant 48 votes out of the 174, which we find he was entitled to. We also find

that appellant was entitled to 23 votes in the second pre-
cinct of Embarrass township, and that he is entitled to bal-
lots 101, 102, 106, 107 and 172, making his total vote as
ascertained by this court 3424.    Appellee had 3346 votes
which were unquestioned and the trial court properly gave
him 72 out of the 174 ballots that were in question.    The
trial court improperly gave him ballot No. 117 and improp-
erly refused to count for him ballots Nos. 95, 104 and 111,
making his total vote as ascertained by this court 3423.    It
therefore follows that appellant, Howard M. Winn, was
duly elected sheriff of Edgar county by one vote, and that
the county court erred in finding that John I. Blackman had
been elected and in rendering judgment against appellant
for costs.

The judgment of the county court of Edgar county will
be reversed and the cause remanded to that court, with di-
rections to enter a judgment in favor of appellant.

*Reversed and remanded.*

Mr. JUSTICE CARTWRIGHT, concurring:

I agree with the conclusion that appellant was elected
sheriff of Edgar county, but think the county court erred in
refusing to count the five ballots cast for him in the first
precinct of Young America which bore the initials of one
of the judges endorsed thereon by another judge.    I do not
think a voter should be deprived of his vote by a mistake
of the election officers where the voter is not at fault and
the ballot itself shows that it is a genuine official ballot de-
livered to the voter by the judges.    That, I think, is the
purport of the decision in *Caldwell* v. *McElvain,* 184 Ill. 552.
In the case of *Choisser* v. *York,* 211 Ill. 56, the initials of
one of the judges were stamped upon the ballots with a rub-
ber stamp, which could be used by any person, and such
initials afforded no means of identifying the ballots.    The
decision was upon the ground that the statute contemplates
an endorsement in the handwriting of one of the judges, for

the very good reason that every man's handwriting possesses certain peculiarities which distinguish it from every other, and if the initials are written by one of the judges the genuine ballots delivered to the voters may be distinguished from spurious ones. In this case the initials of one of the judges were written by another judge in his own handwriting, and the purpose of the statute was accomplished. The ballots were the genuine official ballots delivered to the voters who cast them, and I think they should have been counted.

Mr. JUSTICE CARTER: I concur in the views of Justice CARTWRIGHT.

Mr. JUSTICE SCOTT, specially concurring:

I concur in the conclusion stated in the opinion delivered by Mr. Justice VICKERS but not in all that is said therein. I deem it necessary to state my adverse views only in so far as the five ballots cast in Young America precinct, which are exhibits 166 to 170, inclusive, are concerned. It is my judgment that these five ballots should be counted for the republican candidate. In *Choisser* v. *York*, 211 Ill. 56, it was held that the use of a rubber stamp by one of the election judges for the purpose of endorsing his initials on the ballots was improper, and that all ballots so endorsed were unlawful and should be rejected, even where they were otherwise free from legal objection. I was not in accord with the majority of the court in that case, and my views are fully stated in the dissenting opinion therein. If the opinion of Mr. Justice VICKERS as to the five ballots here in question should ever become the opinion of the majority of this court, the doctrine of *Choisser* v. *York*, in this regard, would be extended, which I think should not be done.

Mr. JUSTICE DUNN took no part in the consideration or decision of this case.